UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 23-20464-CR-BLOOM/TORRES

18 U.S.C. § 371
18 U.S.C. § 951
18 U.S.C. § 1343
18 U.S.C. § 1542
18 U.S.C. § 1001(a)(2)
18 U.S.C. § 981
18 U.S.C. § 982

FILED BY MP D.C.
Dec 5, 2023
ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

UNITED STATES OF AMERICA

vs.

VICTOR MANUEL ROCHA,

Defendant.
_______________________________/

# INDICTMENT

The Grand Jury charges that:

## GENERAL ALLEGATIONS

At all times relevant to this Indictment, unless alleged otherwise:

### Oath of Office

1. Civilian employees of the United States government, including its diplomats, are bound by an Oath of Office, pursuant to Title 5, United States Code, Section 3331, which requires them to swear or affirm that:

> I will support and defend the Constitution of the United States against all enemies foreign and domestic; that I will bear true faith and allegiance to the same; that I take this obligation freely, without any mental reservation or purpose of evasion; and that I will well and faithfully discharge the duties of the office on which I am about to enter. So help me God.

## The Defendant

2. **VICTOR MANUEL ROCHA** was born on or about October 23, 1950, in Colombia. He became a naturalized United States citizen in or around 1978.

3. Between in or around November 1981 and August 2002, **VICTOR MANUEL ROCHA** was employed by the United States Department of State, a department of the United States government that manages the United States' relationships with foreign governments and implements U.S. foreign policy.

## The Defendant's Failure to Disclose His Activity as a Foreign Agent

4. At no time did **VICTOR MANUEL ROCHA** provide notification to the United States Attorney General or the Secretary of State that he was, in fact, acting as an agent of a foreign government.

## The Republic of Cuba

5. The government of the Republic of Cuba is an internationally recognized foreign government.

6. According to the United States Department of State's Country Report on Human Rights Practices, Cuba is an authoritarian state. From in or around 1959 until 2007, Cuba was ruled by Fidel Castro. From in or around 2007 until 2021, Fidel Castro's brother, Raúl Castro, ruled Cuba. Since in or around April 2021, Miguel Díaz-Canal Bermúdez has ruled Cuba.

7. Since the Cuban Revolution, members and associates of Cuba's Communist Party, including Cuba's intelligence services, used the Spanish term "Comandante" to refer to Fidel Castro, and the term "Compañero," which means comrade in English, to refer to fellow regime loyalists.

8. From in or around 1961 until July 2015, the United States did not maintain diplomatic relations with the government of the Republic of Cuba. From in or around 1977 until July 2015, the United States Interests Section of the Swiss Embassy in Havana, Cuba, was designated as the official representative of the United States government to Cuba.

9. Starting with Fidel Castro's ascent to power, the Republic of Cuba viewed the United States as its primary threat, and Cuban government officials referred to the United States as an enemy of Cuba.

10. Between 1982 and 2015, and from 2021 until the present, the United States Department of State designated Cuba as a state sponsor of international terrorism in its State Sponsors of Terrorism List, due to Cuba's support for international terrorism and subversion of United States justice.

11. The Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996, codified at Title 22, United States Code, Section 6021, signed into law by the President of the United States on March 12, 1996, found that, since 1960, the Cuban government posed a national security threat to the United States, harbored fugitives from justice in the United States, and utilized blackmail and other illegal forms of conduct to influence the actions of sovereign states in the Western Hemisphere.

12. Each year from 1963 through the present, with respect to Cuba, the President of the United States exercised his authority under the Trading With the Enemy Act, Title 50, United States Code, Section 4305.

## Cuban Intelligence Activities in the United States

13. Cuba's intelligence services include numerous intelligence and counterintelligence entities, including the Directorate of Intelligence, also known as the General Directorate of Intelligence (collectively, "DGI"). The DGI is charged with gathering worldwide intelligence information of interest to Cuba and its allies.

14. Members and associates of Cuba's intelligence services use the Spanish term "Dirección" to refer to the DGI.

15. The United States was, and continues to be, the principal target for Cuba's intelligence gathering.

16. The DGI spots and assesses persons within the United States, including employees of the United States government, who may be suitable for recruitment to serve a variety of roles on behalf of Cuba's interests.

17. One of the most important of these roles is that of agent – that is, a person who is not an officially recognized employee of the DGI but who is aware he or she is working for the service and is willing to engage in clandestine operational activity, including intelligence gathering, at the direction, and on behalf, of the DGI.

18. Praising one such agent who was also a United States government employee, **VICTOR MANUEL ROCHA**, in a recorded conversation on February 17, 2023, said: "Unfortunately, she was betrayed … a huge betrayal … sadly she would have done much more had she not been betrayed." In a subsequent recorded conversation on June 23, 2023, **ROCHA** identified her as "Ana."

19.     A parole is a password or recognition phrase or item used between an agent and his handler, or between intelligence officers, as a security protocol.

20.     A legend is an agent's artificial background or a feature of his biography used to maintain his covert status.

**The Defendant's Access to United States Government Information**

21.     Throughout his employment at the United States Department of State, **VICTOR MANUEL ROCHA** had unique access to nonpublic United States government information.

22.     Nonpublic information includes information an employee gains by reason of federal employment that he knows or reasonably should know has not been made available to the general public.

23.     United States law imposes restrictions on how a person can use information obtained in the course of a person's employment by the United States.

24.     Some nonpublic United States government information may be subject to additional restrictions, including sensitive information and classified information whose unauthorized disclosure could be expected to cause damage to United States national security. Some types of classified information are subject to even further restrictions, including Top Secret information, whose unauthorized disclosure could be expected to cause exceptionally grave damage to United States national security, and Sensitive Compartmented Information (SCI).

25.     In handling nonpublic information, and in all other respects during his employment, **VICTOR MANUEL ROCHA** was required to adhere to his Oath of Office, including his promise to "support and defend" the United States against its foreign enemies. This oath lies at the heart of the relationship between the United States and its employees.

26. At no time was **VICTOR MANUEL ROCHA** authorized, directly or indirectly, to deliver, communicate, or transmit nonpublic information to agents, officers, or employees of any hostile foreign intelligence service, during or after his employment.

## COUNT 1
**Conspiracy to Act as An Agent of a Foreign Government and to Defraud the United States (18 U.S.C. § 371)**

1. The General Allegations section of this Indictment is re-alleged and incorporated by reference as though fully set forth herein.

2. From a date unknown to the Grand Jury, but no later than in or around November 1981, through on or about December 1, 2023, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendant,

**VICTOR MANUEL ROCHA,**

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate and agree with others unknown to the Grand Jury, including agents, officers, and representatives of the Republic of Cuba:

a. to commit an offense against the United States, that is, to act in the United States as an agent of a foreign government, namely, as an agent of the Republic of Cuba, without prior notification to the Secretary of State prior to October 12, 1984, and to the Attorney General thereafter, as required by law, in violation of Title 18, United States Code, Section 951; and

b. to defraud the United States and its agencies by impeding, impairing, obstructing, and defeating the lawful governmental functions of the United States.

## PURPOSE OF THE CONSPIRACY

3. It was a purpose of the conspiracy for the defendant to: (a) act as a clandestine agent of the Republic of Cuba, without prior notification to the Attorney General or the Secretary of State as required by law; (b) further the interests of the Republic of Cuba; (c) harm interests of the United States; (d) fraudulently obtain and maintain employment with the Department of State; (e) deprive the United States, through fraud and deceit, of control over its nonpublic information, including sensitive and classified information, and provide such information to agents or representatives of the Republic of Cuba; and (f) evade discovery and detection at all times by the United States government.

## THE LAWFUL GOVERNMENT FUNCTIONS

4. It is a lawful function of the United States and its agencies, including the Department of State, to further United States foreign policy interests in its dealings with foreign governments.

5. These interests include but are not limited to those identified in the Department of State's mission to protect and promote United States security, prosperity, and democratic values.

6. During and after his employment by the Department of State, **VICTOR MANUEL ROCHA** conspired to impede, impair, obstruct, and defeat the United States' lawful function of promoting and protecting its foreign policy interests, by seeking instead to serve the interests of the Republic of Cuba, a hostile, undemocratic regime, and by concealing his clandestine activity to prevent the United States from investigating and addressing the harm from his activity to United States interests.

7. It is another lawful function of the United States, and its agencies including the Department of State, to control its information, including but not limited to protecting nonpublic information against unauthorized disclosure.

8. To safeguard United States interests, and to further the State Department's mission, the United States and the Department of State control how certain information can be accessed, provided, shared, and used. This control is especially critical for sensitive or classified information or information that may be disclosed to a hostile foreign intelligence service.

9. During and after his employment by the Department of State, **VICTOR MANUEL ROCHA** conspired to impede, impair, obstruct, and defeat the United States' lawful function of controlling its information, by seeking to (a) use his access to such information for the benefit of the DGI, a hostile foreign intelligence service; (b) disclose such information without authorization, and (c) at all times prevent any discovery of or investigation into the past and present harm from these activities to the United States.

**MANNER AND MEANS OF THE CONSPIRACY**

10. It was part of the conspiracy that **VICTOR MANUEL ROCHA** would and did support the Republic of Cuba and its clandestine intelligence-gathering mission against the United States by serving as a DGI agent.

11. It was further part of the conspiracy that **VICTOR MANUEL ROCHA** would and did keep his status as a DGI agent secret at all times in order to protect himself and others and to allow himself the opportunity to engage in additional clandestine activity on behalf of the DGI.

12. It was further part of the conspiracy that **VICTOR MANUEL ROCHA** would and did maintain clandestine contacts with DGI officers and other co-conspirators.

13. It was further part of the conspiracy that, at the direction, and with the assistance, of the DGI, **VICTOR MANUEL ROCHA** would and did obtain and maintain employment in the United States government in positions that would give him access to nonpublic information, including sensitive and classified information.

14. It was further part of the conspiracy that **VICTOR MANUEL ROCHA** would and did obtain money and property, in the form of salary payments and other benefits during and after his employment, from the United States for the benefit of himself and others.

15. It was further part of the conspiracy that **VICTOR MANUEL ROCHA** would and did provide false and misleading information to the United States to obtain and maintain employment, and to acquire and maintain access to sensitive and classified information.

16. It was further part of the conspiracy that **VICTOR MANUEL ROCHA** would and did travel outside the United States to meet with his co-conspirators, and made false and misleading statements to obtain documents needed for that and other travel.

**OVERT ACTS**

In furtherance of the conspiracy, and to accomplish its unlawful purpose, the Defendant, or one of his co-conspirators, committed and caused to be committed within the Southern District of Florida and elsewhere, at least one of the following overt acts, among others:

**Recruitment by the DGI**

1. In or around 1973, while in the Republic of Chile and elsewhere, **VICTOR MANUEL ROCHA** became a "great friend" of the DGI.

2. In or around 1981, having by then become a United States citizen, **VICTOR MANUEL ROCHA** applied for employment with the United States Department of State.

3. As part of his application for employment with the Department of State, on May 1, 1981, **VICTOR MANUEL ROCHA** acknowledged the following warning: "NOTE: While an employee of the Department, you may not act as an agent of a foreign principal within the meaning of the Foreign Agents Registration Act without specific prior approval of the Office of Personnel."

**The Defendant's Employment by the Department of State**

4. From in or around November 1981 until in or around December 1982, as a Department of State employee, **VICTOR MANUEL ROCHA** served as an International Relations Officer at the Department of State.

5. From in or around December 1982 until in or around January 1985, as a Department of State employee, **VICTOR MANUEL ROCHA** served as a Political Officer at the United States Embassy in Santo Domingo, Dominican Republic.

6. From in or around February 1987 until in or around February 1989, as a Department of State employee, **VICTOR MANUEL ROCHA** served as a Political-Military Affairs Officer at the United States Embassy in Tegucigalpa, Honduras.

7. From in or around February 1989 until in or around November 1991, as a Department of State employee, **VICTOR MANUEL ROCHA** served as the First Secretary at the United States Embassy in Mexico City, Mexico.

8. From in or around November 1991 until in or around July 1994, as a Department of State employee, **VICTOR MANUEL ROCHA** served as the Deputy Chief of Mission at the United States Embassy in Santo Domingo, Dominican Republic – a location about which, in a recorded conversation on November 16, 2022, he said: "the Compañeros put down … that instead of meeting here, for security reasons … the contacts … for them to be in … Santo Domingo."

9. From in or around July 1994 until in or around July 1995, as a Department of State employee, **VICTOR MANUEL ROCHA** served as the director of Inter-American Affairs on the United States National Security Council, with special responsibility for, among other things, Cuba.

10. From in or around July 1995 until in or around July 1997, as a Department of State employee, **VICTOR MANUEL ROCHA** served as Deputy Principal Officer at the United States Interests Section in Havana, Cuba. Discussing that assignment in a recorded conversation on November 16, 2022, **ROCHA** described the "moment that I lived through it because I was in charge, it was the knock down of the small planes. That was a time of a lot of tension, … that was the time of the … 'Brothers to the Rescue' and other similar people … who were pushing politics towards unnecessary provocations."

11. From in or around July 1997 until in or around November 1999, as a Department of State employee, **VICTOR MANUEL ROCHA** served as Deputy Chief of Mission at the United States Embassy in Buenos Aires, Argentina.

12. From in or around July 2000 until in or around August 2002, as a Department of State employee, **VICTOR MANUEL ROCHA** served as Ambassador to Bolivia at the United States Embassy in La Paz, Bolivia.

**The Defendant's Conduct to Gain Access to Nonpublic Information**

13. On May 1, 1981, **VICTOR MANUEL ROCHA** completed a Form SF-86 "Security Investigation Data for Sensitive Position" and submitted it to the Department of State.

14. On July 7, 1981, **VICTOR MANUEL ROCHA** obtained a Top Secret security clearance, a requirement for his Department of State employment.

15. On November 25, 1981, **VICTOR MANUEL ROCHA** signed a Security

Agreement in which he acknowledged he could not publish or reveal to any person, either during or after his State Department employment, any classified or administratively controlled information, or any other information transmitted to him in confidence in the course of his official duties.

16.    On June 30, 1982, **VICTOR MANUEL ROCHA** signed a sworn statement stating he was fully aware of the rules and regulations concerning the handling of the Department of State documents.

17.    On January 12, 1989, **VICTOR MANUEL ROCHA** signed a Classified Information Nondisclosure Agreement, in which he acknowledged that unauthorized disclosure of classified information could cause irreparable injury to the United States or could be used to advantage a foreign nation.

18.    On August 29, 1990, **VICTOR MANUEL ROCHA** signed a sworn statement stating he was familiar with the security procedures regarding the storage and handling of classified information.

19.    On July 11, 1994, **VICTOR MANUEL ROCHA** signed a Briefing Acknowledgement in which he acknowledged receiving a briefing regarding the storage, control, transportation, loss, or compromise of classified information.

20.    On or about September 2, 1993, **VICTOR MANUEL ROCHA** successfully completed a background investigation for a continued TOP SECRET security clearance.

21.    In or around March 1994, as part of his National Security Council appointment, **VICTOR MANUEL ROCHA** obtained a TOP SECRET/SCI clearance.

22.    On or about November 4, 1999, **VICTOR MANUEL ROCHA** cleared a

background investigation for a continued TOP SECRET security clearance.

**The Defendant's False Statements to the United States About His Loyalties**

23. On May 1, 1981, **VICTOR MANUEL ROCHA** made the following false statements in an SF-86 Pre-employment Questionnaire for National Security Positions:

a. "Are you now or have you ever been an agent or representative of, or otherwise employed by or acted for a foreign principal, either personally or through association with a firm?" **ROCHA** responded, "No."

b. "Are you now or have you ever been a member of any foreign or domestic organization, association, movement, group, or combination of persons which is totalitarian, fascist, communist, or subversive." **ROCHA** responded, "No."

24. On June 8, 1981, **VICTOR MANUEL ROCHA** completed a security interview in Washington, D.C., in which he falsely stated, among other things, he had never been asked by anyone to commit an illegal act, or to act against the interest of the United States.

25. On September 22, 1991, **VICTOR MANUEL ROCHA** falsely stated in an SF-86 Questionnaire for National Security Positions that he had not ever "been employed by or acted as a consultant for a foreign government, firm or agency."

26. On March 28, 1994, **VICTOR MANUEL ROCHA** falsely stated in an SF-86 Questionnaire for National Security Positions that he had not ever "been employed by or acted as a consultant for a foreign government, firm or agency."

27. On May 8, 1994, **VICTOR MANUEL ROCHA** made false statements during an FBI background investigation interview conducted at the United States Embassy in Santo Domingo, Dominican Republic, regarding his appointment to the United States National Security

Council, including but not limited to, falsely stating that he did not know of any situation, past or present, which could have a bearing on his suitability for employment with the U.S. government, and that there was nothing in his personal life that may negatively affect his appointment to the National Security Council or that could be used against him.

28. On or about February 7, 1995, while serving on the National Security Council, **VICTOR MANUEL ROCHA** applied for a United States passport, submitted the photograph below as part of that application, and affirmed under oath, as part of that application, that he had not since becoming a United States citizen "accepted or performed the duties of any office, post, or employment under the Government of a foreign state or political subdivision thereof."

29. On August 25, 1999, **VICTOR MANUEL ROCHA** made the following false statements in an SF-86 Questionnaire for National Security Positions:

a. "Are you now or have you ever been employed by or acted as a consultant for a foreign government, firm, or agency?" **ROCHA** responded, "No."

b. "Have you ever had any contact with a foreign government, its establishments (embassies or consulates), or its representatives, whether inside or outside the U.S.

other than on official U.S. Government business?" **ROCHA** responded, "No."

c. "Is there anything in your personal life that could be used by someone to coerce or blackmail you? Is there anything in your life that could cause an embarrassment to you or to the President if publicly known?" **ROCHA** responded, "No."

30. On August 26, 1999, **VICTOR MANUEL ROCHA** falsely stated on a Senate Ambassador Nomination Questionnaire that there were no issues regarding his personal integrity that "may be an issue in the Committee's consideration of [**ROCHA's**] nomination."

31. On or about September 13, 1999, **VICTOR MANUEL ROCHA** made the following false statements during a State Department security interview conducted at the United States Embassy in Buenos Aires, Argentina, regarding **ROCHA's** appointment as United States Ambassador to Bolivia:

a. **ROCHA** falsely stated he did not have any problems that would prevent him from accepting a presidential appointment;

b. **ROCHA** falsely stated there was not any information he knew that could suggest a conflict of interest or be a possible source of embarrassment to him, the Department of State, or the President of the United States;

c. **ROCHA** falsely stated he had not performed any work or employment for or received payment from any foreign government, foreign business, or foreign national;

d. **ROCHA** falsely stated he had never been an agent or representative or employed or acted for a foreign principal, either personally or through association with a firm;

e. **ROCHA** falsely stated he did not have any regular contact with foreign nationals outside of family or official business;

    f. **ROCHA** falsely stated he never had an association with a person, group, or business venture that could be used, even unfairly, to criticize, to impugn or attack his character and qualifications for a high-level government position;

g. **ROCHA** falsely stated he had never been employed by, or acted as a consultant on behalf of, any foreign government, firm or agency;

h. **ROCHA** falsely stated he was not aware of any circumstances that could support his recruitment by a foreign intelligence service now or in the future; and

i. **ROCHA** falsely stated he had not had any contact with Cuban government officials since his departure from Cuba in or around 1997.

**<u>The Defendant's Activities After Leaving the State Department</u>**

32. Beginning in or around August 2002, and continuing to the present, **VICTOR MANUEL ROCHA** collected benefits, including monthly retirement annuity payments, based upon his prior employment at the Department of State.

33. On February 23, 2005, **VICTOR MANUEL ROCHA** applied for a United States passport, and affirmed under oath, as part of that application, that he had not since becoming a United States citizen "accepted or performed the duties of any office, post, or employment under the government of a foreign state or political subdivision thereof."

34. From in or around 2006 until in or around 2012, **VICTOR MANUEL ROCHA** was an advisor to the Commander of the United States Southern Command, a joint command of the United States military whose area of responsibility includes Cuba.

35. On November 22, 2011, **VICTOR MANUEL ROCHA** applied for a United States passport, and affirmed under oath, as part of that application, that he had not since becoming a

United States citizen "accepted or performed the duties of any office, post, or employment under the government of a foreign state or political subdivision thereof."

36. On September 15, 2014, **VICTOR MANUEL ROCHA** applied to renew his United States passport, and affirmed under oath, as part of that application, that he had not since becoming a United States citizen "accepted or performed the duties of any office, post, or employment under the government of a foreign state or political subdivision thereof."

37. On February 24, 2016, in Miami, Florida, **VICTOR MANUEL ROCHA** applied for a United States passport, and affirmed under oath, as part of that application, that he had not "accepted or performed the duties of any office, post, or employment under the government of a foreign state or political subdivision thereof."

38. On or about January 2, 2017, using a United States passport bearing a number ending in -3729, **VICTOR MANUEL ROCHA** flew from Miami International Airport in Miami, Florida to Santo Domingo, Dominican Republic.

39. On or about January 3, 2017, using a Dominican Republic passport bearing a number ending in -1482, **VICTOR MANUEL ROCHA** flew from Santo Domingo, Dominican Republic to Panama City, Panama and then to Havana, Cuba.

40. On or about January 7, 2017, using a Dominican Republic passport bearing a number ending in -1482, **VICTOR MANUEL ROCHA** flew from Havana, Cuba to Panama City, Panama, and then to Santo Domingo, Dominican Republic.

41. On or about January 8, 2017, using a United States passport bearing a number ending in -3729, **VICTOR MANUEL ROCHA** flew from Santo Domingo, Dominican Republic to Miami International Airport in Miami, Florida.

42. On or about May 17, 2018, in Miami, Florida, **VICTOR MANUEL ROCHA** applied for a United States passport, and affirmed under oath, as part of that application, that since becoming a United States citizen he had not "accepted or performed the duties of any office, post, or employment under the government of a foreign state or political subdivision thereof."

43. On or about November 13, 2019, in Miami, Florida, **VICTOR MANUEL ROCHA** applied for a United States passport, and affirmed under oath, as part of that application, that since becoming a United States citizen he had not "accepted or performed the duties of any office, post, or employment under the government of a foreign state or political subdivision thereof."

**The Defendant's Contacts with the Undercover DGI Representative**

44. On or about November 15, 2022, while in Miami, Florida, **VICTOR MANUEL ROCHA** responded to a WhatsApp message from an individual purporting to be a covert DGI representative but who was, in fact, a Federal Bureau of Investigation undercover employee ("UC"). The message read: "Good Afternoon ambassador, my name is Miguel and I have a message for you from your friends in Havana. It is in regards to a sensitive matter. Are you available for a phone call?" **ROCHA** replied: "I don't understand but you can call me."

45. On or about November 15, 2022, **VICTOR MANUEL ROCHA** participated in a phone call with the UC, in which the UC informed **ROCHA** that his name was "Miguel" and that he was "representing your friends in Havana." The UC further informed **ROCHA** that he was "ordered to make contact with you to give you a message. I know that you have been a great friend of ours since your time in Chile." The UC then explained that "we have little problems in the island and in our embassy in Santo Domingo as well, but don't worry, I'm here to resolve the

situation, but these are very delicate issues, and it would be best to talk about it in person." **ROCHA** agreed to meet the UC in person the following day in front of a church on 6th Street in the Brickell neighborhood of Miami at 10:00 am.

## The First UC Meeting: November 16, 2022

46. On November 16, 2022, **VICTOR MANUEL ROCHA** met the UC in front of the First Miami Presbyterian Church at 609 Brickell Avenue, Miami, Florida, at approximately 10:00 am.

47. On November 16, 2022, while traveling to the meeting location, **VICTOR MANUEL ROCHA** used counter-surveillance techniques, later telling the UC that "they are not going to see me when I come out over here … that's what I did today … I did a whole route … It's what I've always been told to do."

48. On November 16, 2022, at the start of his meeting with the UC, **VICTOR MANUEL ROCHA** guided the UC to a "food court" near their location with "low-level employees who don't want to spend too much money. So, there's no possibility for – for anyone to see me." **ROCHA** referred to this as a "measure … out of precaution" because "I have always … received sufficient training to know that you must be on the alert … to provocations."

49. On November 16, 2022, during their meeting, **VICTOR MANUEL ROCHA** made the following statements, among others, to the UC intended to further the conspiracy:

a. **ROCHA** explained that, during a prior meeting with the DGI, he was told that "if at any given moment there was a need to contact or see each other … I'm almost sure that they said it would be someone named Miguel."

b. **ROCHA** answered "Yes" when told by the UC that the UC was "a covert

representative here in Miami" whose mission was "to contact you, introduce myself as your new contact, and establish a new communication plan."

c. **ROCHA** told the UC: "I want you to tell my Compañeros that I appreciate, and I am very thankful for this alert," explaining that during his last contact, "I was able to travel … to the capital and while I was there I had a long meeting … In Havana." **ROCHA** then added, regarding the UC's explicit reference to "Havana" during their initial conversations: "We have another name. We never utilize Havana. … I tend to say 'The Island.' … I never use C or H ... [T]hat was the only thing that … I thought, if someone has betrayed and told the enemy's counterintelligence … why are they utilizing … Havana … But … Miguel is what I remembered, because I don't write anything down . . . I try to memorize things … for security reasons."

d. **ROCHA** said "since the Dirección" asked me … to lead a normal life … I have [] created the legend of a right-wing person."

e. **ROCHA** said this meeting was "my first contact – since my [] last trip to [] Havana," which **ROCHA** stated was in "2016 or 2017," when he traveled to Havana via Panama and "from Panama … I entered … as a Dominican," referring to his use of his Dominican Republic passport instead of his United States passport.

f. **ROCHA** further explained that "'I always told myself, 'The only thing that can put everything we have done in danger is … someone's betrayal, someone who may have met me, someone who may have known something at some point.''"

g. **ROCHA** assured the UC that his "number one concern" was "any action on the part of Washington that would – would endanger the life of … the leadership, or the – or the revolution itself."

       i. **ROCHA** asked the UC to send "my warmest regards to the Dirección," and after the UC promised to do so, **ROCHA** said the following:

**ROCHA**: [I]t was decades - it was decades. I mean, decades that were deep -
UC: How many years?
**ROCHA**: Almost 40 -
UC: Wow.
**ROCHA**: Uh - and a lot of danger. … They must have told you something because you mentioned Chile. … That … inspired trust in me and at the same time I thought, if there's a traitor and they know that I was in Chile …
**ROCHA**: I have to tell you something.
UC: Tell me.
**ROCHA**: [I]t gives me a lot of … pride and satisfaction to see that – that people like Miguel, who are – who are much younger, but -
UC: Thank you!
**ROCHA**: – who are there – … doing… this is not easy –
UC: No, no, it is not easy. No, it is a struggle –
**ROCHA:** It is not easy – …
UC: Thank you for your friendship and help for so many years. Right? Thank you very much.
**ROCHA**: Of course, no problem … This is a huge sacrifice … huge, with a lot of tension that you have to manage internally … with self-discipline … all the time. … When you have the conviction, you have self-discipline –

50. On November 16, 2022, during their meeting, **VICTOR MANUEL ROCHA** agreed to meet the UC again on February 10, 2023, with February 17, 2023, as a backup date.

51. On November 16, 2022, during his meeting with the UC, **VICTOR MANUEL ROCHA** agreed to utilize a Colombian Pesos bill as a parole at the next meeting to ensure operational security.

52. On November 16, 2022, during his meeting with the UC, **VICTOR MANUEL**

**ROCHA** proposed a different option, if the pair could not meet in Miami, was a food court at a specified location in Santo Domingo, Dominican Republic since "low-income people … go to the food court" and accordingly **ROCHA** would not be identified.

**<u>The Second UC Meeting: February 17, 2023</u>**

53. On February 17, 2023, **VICTOR MANUEL ROCHA** met the UC in person at the outdoor food court behind the First Miami Presbyterian Church at 609 Brickell Avenue, Miami, Florida.

54. On February 17, 2023, when traveling to the meeting with the UC, **VICTOR MANUEL ROCHA** used counter-surveillance techniques consistent with directions given to him by the DGI.

55. On February 17, 2023, upon meeting the UC, **VICTOR MANUEL ROCHA** utilized a Colombian Pesos bill as a parole, and complimented the UC on the UC's cover story for their meeting.

56. On February 17, 2023, **VICTOR MANUEL ROCHA** told the UC, regarding their meeting location: "I have my bank here … So, it's my legend for being here."

57. On February 17, 2023, **VICTOR MANUEL ROCHA** assured the UC "But of course" when told the DGI wanted to confirm "that you continue to be a Compañero of ours."

58. On February 17, 2023, **VICTOR MANUEL ROCHA** promised the UC that "if I had access to something that was worthwhile, I – I would propose it … and the access … it's having access to information that's important."

59. On February 17, 2023, during their meeting, **VICTOR MANUEL ROCHA** described to the UC some of his activities on behalf of the DGI and against United States' interests,

and explained why and how he continued to preserve the secrecy of those activities, stating among other things:

a. **ROCHA**: "[F]or me, what has been done, has strengthened the Revolution. It has strengthened it immensely. [W]e can't put - put that in danger. … I'm very zealous in regards to what we have done and with what I have to protect."

b. **ROCHA**: "I have to protect what we did because what we did … because what we did is – is – is the cement that has strengthened the last 40 years. I mean, that cement is concrete. It's not [UI], it's concrete. You know?"

c. **ROCHA**: "I wouldn't put what we have done in danger … because … they would react strongly against the Revolution … strongly because of the fact that through my participation we – we did what we did."

d. **ROCHA**: "[T]hey underestimated what we could do to them. We did more than they thought."

60. On February 17, 2023, during his meeting with the UC, **VICTOR MANUEL ROCHA** celebrated his work for the DGI, as confirmed in the screenshot below from close-captioned video of the meeting, by saying that: "What we have done … it's enormous … More than a grand slam."



61. On February 17, 2023, during their meeting, **VICTOR MANUEL ROCHA** lamented "the blows that the enemy," meaning the United States, "has dealt to the current revolution."

62. On February 17, 2023, during his meeting with the UC, **VICTOR MANUEL ROCHA** praised "The Comandante," referring to Fidel Castro.

63. On February 17, 2023, **VICTOR MANUEL ROCHA** agreed to meet the UC a third time, and made arrangements for that meeting including a back-up plan, reassuring the UC that "you can ask the Dirección … I was always there."

**The Third UC Meeting: June 23, 2023**

64. On June 23, 2023, **VICTOR MANUEL ROCHA** met the UC in person at the outdoor food court behind the First Miami Presbyterian Church at 609 Brickell Avenue, Miami, Florida.

65. On June 23, 2023, when traveling to his meeting with the UC, **VICTOR MANUEL ROCHA** used counter-surveillance techniques consistent with the directions given to him by the DGI.

66. On June 23, 2023, during their meeting, when told by the UC that "the Dirección wants to ensure that you are still a Compañero of ours … Are you still with us?," **VICTOR MANUEL ROCHA** responded: "I am angry. I'm pissed off. … Because of the question that was asked. … I[t]'s like questioning my manhood. … It's like you want me to drop them … and show you if I still have testicles."

67. On June 23, 2023, **VICTOR MANUEL ROCHA** promised the UC that, if there were an investigation by the United States, he knew "how to handle it," and assured the UC: "I

know how to defend myself. … I have the intelligence … and I have the knowledge. I mean… in the course of my duties, how many times did I meet with – with them … to answer questions … I know how it works the – the system."

68. On June 23, 2023, **VICTOR MANUEL ROCHA** stated to the UC that "I never – never have in 40 years put a Compañero in danger. Or others, never. [T]here are certain rules … from this type of work that, be it us, be them, be the Russians … So then, whoever is in a mission doesn't see the other one in another. That is simply a no, because it jeopardizes everything."

69. On June 23, 2023, **VICTOR MANUEL ROCHA** promised the UC that "I protect – I protect everything that has been done. I have always protected it and will protect it and I know how to protect it."

70. On June 23, 2023, **VICTOR MANUEL ROCHA** made arrangements to meet a fourth time with the UC in or around December 2023.

All in violation of Title 18, United States Code, Section 371.

**COUNT 2**
**Acting as an Illegal Agent of a Foreign Government**
**(18 U.S.C. § 951)**

1. The General Allegations section of this Indictment is re-alleged and incorporated by reference as though fully set forth herein.

2. From a date unknown to the Grand Jury, but no later than in or around November 1981, through on or about December 1, 2023, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendant,

**VICTOR MANUEL ROCHA,**

did knowingly act in the United States as an agent of a foreign government, namely, as an agent

of the Republic of Cuba, without prior notification to the Secretary of State prior to October 12, 1984, and to the Attorney General thereafter, as required by law, in violation of Title 18, United States Code, Section 951.

**COUNTS 3 - 7**
**Wire Fraud**
**(18 U.S.C. § 1343)**

On or about the dates specified as to each count below, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendant,

**VICTOR MANUEL ROCHA,**

did knowingly, and with intent to defraud, devise and intend to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing the pretenses, representations, and promises were false and fraudulent when made, and, for the purpose of executing the scheme and artifice, did knowingly transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds, in violation of Title 18, United States Code, Section 1343.

**PURPOSE OF THE SCHEME AND ARTIFICE**

1. It was a purpose of the scheme and artifice for **VICTOR MANUEL ROCHA**, aided by his accomplices, to unlawfully enrich himself while furthering the intelligence interests of the Republic of Cuba and harming interests of the United States, by using materially false and fraudulent pretenses, representations, and promises, and by making material omissions, to obtain and maintain employment at the Department of State and thereby to obtain money and property in the form of salary and other benefits during and after his employment, including annuity payments

upon retirement, from the United States.

## MANNER AND MEANS OF THE SCHEME AND ARTIFICE

2. The General Allegations section and Paragraphs 10-16 of the Manner and Means section from Count 1 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein as the description of the manner and means of the scheme and artifice.

## USE OF THE WIRES

3. On or about the dates specified as to each count below, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendant, **VICTOR MANUEL ROCHA**, for the purpose of executing and in furtherance of the aforesaid scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing the pretenses, representations, and promises were false and fraudulent when made, did knowingly transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds, as more specifically described below:

| COUNT | APPROXIMATE DATE | DESCRIPTION OF WIRE COMMUNICATION |
|---|---|---|
| 3 | June 3, 2019 | Transmission of an annuity payment of $4,937.49, from a United States government account in Kansas City, Missouri, to a **VICTOR MANUEL ROCHA** controlled bank account ending in -4746 in the Southern District of Florida. |
| 4 | August 3, 2020 | Transmission of an annuity payment of $5,000.10, from a United States government account in Kansas City, Missouri, to a **VICTOR MANUEL ROCHA** controlled bank account ending in -4746 in the Southern District of Florida. |
| 5 | April 1, 2021 | Transmission of an annuity payment of $4,414.60, from a United States government account in Kansas City, Missouri, to a **VICTOR MANUEL ROCHA** controlled bank account ending in -4746 in the Southern District of Florida. |

| COUNT | APPROXIMATE DATE | DESCRIPTION OF WIRE COMMUNICATION |
|---|---|---|
| 6 | October 3, 2022 | Transmission of an annuity payment of $4,905.59, from a United States government account in Kansas City, Missouri, to a **VICTOR MANUEL ROCHA** controlled bank account ending in -4746 in the Southern District of Florida. |
| 7 | July 3, 2023 | Transmission of an annuity payment of $5,411.61, from a United States government account in Kansas City, Missouri, to a **VICTOR MANUEL ROCHA** controlled bank account ending in -4746 in the Southern District of Florida. |

All in violation of Title 18, United States Code, Section 1343.

**COUNTS 8-10**
**Making a False Statement in a Passport Application**
**(18 U.S.C. § 1542)**

1. The General Allegations section of this Indictment is re-alleged and incorporated by reference as though fully set forth herein.

2. On or about the dates specified in each count below, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendant,

**VICTOR MANUEL ROCHA,**

did willfully and knowingly make a false statement in an application for a passport with the intent to induce and secure the issuance of a passport under the authority of the United States for his own use, contrary to the laws regulating the issuance of passports and the rules prescribed pursuant to such laws, in that the defendant stated that since becoming a United States citizen he had not accepted or performed the duties of any office, post, or employment under the government of a foreign state or political subdivision thereof, when in truth and in fact, and as the defendant then and there well knew, he had accepted and performed such duties under the government of a foreign state, namely, the Republic of Cuba, as specified in each count below:

| COUNT | APPROXIMATE DATE | FORM | PASSPORT APPLICATION NUMBER |
|---|---|---|---|
| 8 | February 24, 2016 | DS-11 09-2013 | 511321298 |
| 9 | May 17, 2018 | DS-82 01-2017 | 512456790 |
| 10 | November 13, 2019 | DS-82 01-2017 | 512659474 |

All in violation of Title 18, United States Code, Section 1542.

**COUNTS 11-14**
**Use of a Passport Obtained by a False Statement**
**(18 U.S.C. § 1542)**

1. The General Allegations section of this Indictment is re-alleged and incorporated by reference as though fully set forth herein.

2. On or about the dates specified in each count below, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendant,

**VICTOR MANUEL ROCHA,**

did willfully and knowingly use a passport, the issue of which was secured by reason of a false statement, in that **ROCHA** stated on his application for this passport that since becoming a United States citizen he had not accepted or performed the duties of any office, post, or employment under the government of a foreign state or political subdivision thereof, when in truth and in fact, and as **ROCHA** then and there well knew, he had accepted and performed such duties under the government of a foreign state, namely, the Republic of Cuba, as specified in each count below:

| COUNT | APPROXIMATE DATE | LOCATION | TRIP |
|---|---|---|---|
| 11 | November 4, 2016 | Miami International Airport | Arrival from Havana, Cuba |
| 12 | January 2, 2017 | Miami International Airport | Departure to Santo Domingo, Dominican Republic en route to Havana, Cuba |
| 13 | January 8, 2017 | Miami International Airport | Arrival from Santo Domingo, Dominican Republic en route from Havana, Cuba |
| 14 | November 17, 2017 | Miami International Airport | Arrival from Havana, Cuba |

All in violation of Title 18, United States Code, Section 1542.

**COUNT 15**
**False Statement and Representation**
**(18 U.S.C. § 1001(a)(2))**

1. The General Allegations section of this Indictment is re-alleged and incorporated by reference as though fully set forth herein.

2. On or about December 1, 2023, in Miami-Dade County, in the Southern District of Florida, the defendant,

**VICTOR MANUEL ROCHA,**

in a matter within the jurisdiction of the executive branch of the United States government, did knowingly and willfully make a materially false, fictitious, and fraudulent statement and representation, in that, during a recorded interview with federal officials:

a. Upon being shown two images of the UC, **ROCHA** stated that had never met, seen, or had any conversation with the person shown in the images;

b. Upon being shown an image of **ROCHA** sitting across a table from the UC during the June 23, 2023, meeting, **ROCHA** stated he met the UC only one

time, for a couple of minutes; and

c. **ROCHA** stated that the person with him in the image described in subparagraph (c), above, never provided his name.

when in truth and in fact, as **ROCHA** then and there well knew, each of these statements and representations was false, in violation of Title 18, United States Code, Section 1001(a)(2).

**FORFEITURE ALLEGATIONS**

1. The allegations of this Indictment are hereby re-alleged and by this reference fully incorporated herein for the purpose of alleging forfeiture to the United States of certain property in which the defendant, **VICTOR MANUEL ROCHA**, has an interest.

2. Upon conviction of a violation of Title 18, United States Code, Section 1343, as alleged in this Indictment, the defendant shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to such offense, pursuant to Title 18, United States Code, Section 981(a)(1)(C).

3. Upon conviction of a violation of Title 18, United States Code, Section 1542, as alleged in this Indictment, the defendant shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(6):

a. any conveyance, including any vessel, vehicle, or aircraft, used in the commission of such offense;

b. any property, real or personal, that constitutes, or is derived from, or is traceable to any proceeds obtained, directly or indirectly, from the commission of such offense; and

c. any property, real or personal, that was used to facilitate, or intended to be used to facilitate, the commission of such offense.

All pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(6), and the procedures set forth at Title 21, United States Code, Section 853, as incorporated by Title 18, United States Code, Section 982(b)(1) and Title 28, United States Code, Section 2461(c).

A TRUE BILL

FOREPERSON

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

JONATHAN D. STRATTON
ASSISTANT UNITED STATES ATTORNEY

JOHN C. SHIPLEY
SENIOR COUNSEL

HEATHER M. SCHMIDT
SENIOR TRIAL ATTORNEY

CHRISTINE A. BONOMO
TRIAL ATTORNEY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

CASE NO.: ____________________

v.

VICTOR MANUEL ROCHA,

______________________________/
Defendant.

CERTIFICATE OF TRIAL ATTORNEY

**Court Division** (select one)
☒ Miami ☐ Key West ☐ FTP
☐ FTL ☐ WPB

**Superseding Case Information:**
New Defendant(s) (Yes or No) _______
Number of New Defendants _______
Total number of counts _____

I do hereby certify that:

1. I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.
2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. §3161.
3. Interpreter: (Yes or No) No
   List language and/or dialect: ______________
4. This case will take 11-20 days for the parties to try.
5. Please check appropriate category and type of offense listed below:

| (Check only one) | | (Check only one) |
|---|---|---|
| I | ☐ 0 to 5 days | ☐ Petty |
| II | ☐ 6 to 10 days | ☐ Minor |
| III | ☒ 11 to 20 days | ☐ Misdemeanor |
| IV | ☐ 21 to 60 days | ☒ Felony |
| V | ☐ 61 days and over | |

6. Has this case been previously filed in this District Court? (Yes or No) No
   If yes, Judge ____________________ Case No. ____________________
7. Has a complaint been filed in this matter? (Yes or No) Yes
   If yes, Magistrate Case No. 23-MJ-4368-Torres
8. Does this case relate to a previously filed matter in this District Court? (Yes or No) No
   If yes, Judge ____________________ Case No. ____________________
9. Defendant(s) in federal custody as of December 1, 2023
10. Defendant(s) in state custody as of ____________________
11. Rule 20 from the __________ District of ______________
12. Is this a potential death penalty case? (Yes or No) No
13. Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard? (Yes or No) No
14. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss? (Yes or No) No
15. Did this matter involve the participation of or consultation with now Magistrate Judge Eduardo I. Sanchez during his tenure at the U.S. Attorney's Office, which concluded on January 22, 2023? No

By: ______________________
JONATHAN STRATTON
Assistant United States Attorney
FL Bar No. 93075

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

PENALTY SHEET

**Defendant's Name**: VICTOR MANUEL ROCHA

**Case No**: ____________________

Count #: 1

Conspiracy to Act as An Agent of a Foreign Government and to Defraud the United States

Title 18 United States Code Section 371
*** Max. Term of Imprisonment: Five Years' Imprisonment**
*** Mandatory Min. Term of Imprisonment (if applicable): N/A**
*** Max. Supervised Release: 3 Years**
*** Max. Fine: $250,000**

Count #: 2

Acting as an Illegal Agent of a Foreign Government

Title 18 United States Code Section 951
*** Max. Term of Imprisonment: Ten Years' Imprisonment**
*** Mandatory Min. Term of Imprisonment (if applicable): N/A**
*** Max. Supervised Release: 3 Years**
*** Max. Fine: $250,000**

Counts #: 3-7

Wire Fraud

Title 18 United States Code Section 1343
*** Max. Term of Imprisonment: Twenty Years' Imprisonment**
*** Mandatory Min. Term of Imprisonment (if applicable): N/A**
*** Max. Supervised Release: 5 Years**
*** Max. Fine: $250,000**

***Refers only to possible term of incarceration, supervised release and fines. It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

PENALTY SHEET

Counts #: 8-10

Making a False Statement in a Passport Application

Title 18, United States Code Section 1542
*** Max. Term of Imprisonment: Ten Years' Imprisonment**
*** Mandatory Min. Term of Imprisonment (if applicable): N/A**
*** Max. Supervised Release: 3 Years**
*** Max. Fine: $250,000**

Counts #: 11-14

Use of a Passport Obtained by a False Statement

Title 18, United States Code Section 1542
*** Max. Term of Imprisonment: Ten Years' Imprisonment**
*** Mandatory Min. Term of Imprisonment (if applicable): N/A**
*** Max. Supervised Release: 3 Years**
*** Max. Fine: $250,000**

Count #: 15

False Statement and Representation

Title 18, United States Code Section 1001(a)(2)
*** Max. Term of Imprisonment: Five Years' Imprisonment**
*** Mandatory Min. Term of Imprisonment (if applicable): N/A**
*** Max. Supervised Release: 3 Years**
*** Max. Fine: $250,000**

***Refers only to possible term of incarceration, supervised release and fines. It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.**