Re: Case No. 1:23-CR 20464-BB-1

USA Vs Victor Manuel Rocha

My name is Carolyn Chester and attached is a letter that I have already sent you, for your reference. I omitted to tell you that I am represented by Poblete Tamargo, with Jason Poblete and Mauricio Tamargo of 600 Cameron St. #411, Alexandria, VA 22314. Phone number is 703-566-3076 or info@pobletetamargo.com

Jason Poblete is the attorney I work directly with, 202-361-0947

Also included is a recent interview with the Nora Gamez Torrez.

Thanking you in advance.

Carolyn Chester



Certified Claimant 1704

Carolyn Chester


April 9, 2024

Honorable Judge Beth Bloom
United States Courthouse
400 North Miami Avenue
Chamber 10-2
Miami, FL 33128

Re: USA vs. Victor Manuel Rocha
Case No. 1:23-CR-20464-BB-1

My name is Carolyn Chester and I represent my family claim against Cuba, which is Certified by the U.S. Foreign Claims Commission, CU 1704.

I am writing to you concerning the plea deal of Ambassador Rocha, who is accused of espionage activities on behalf of Cuba. While I understand the complexities and sensitivities involved in judicial proceedings, especially in cases concerning national security and international relations, I implore you to consider the broader implications of this plea deal on American citizens who have suffered injustices due to actions potentially connected with espionage activities.

More than 64 years ago, my family's property in Cuba was confiscated without compensation, a fate shared by thousands of American families. Efforts to seek justice and compensation have been thwarted, leaving wounds open and unresolved. The intricacies of these cases are deeply entangled with the diplomatic relations between the United States and Cuba, a process that could have been contaminated by espionage activities, including those allegedly conducted by Ambassador Rocha.

It has come to my attention that Ambassador Rocha once directly engaged with me under the guise of resolving my claim. His proposition to purchase my claim was not only unorthodox but raised questions about the legality of his intentions. This interaction suggests a potential manipulation of the settlement process that could have broader implications for many Americans seeking justice. I urge you, as you consider the plea deal before you, to weigh the potential impacts of Ambassador Rocha's actions on the settlement processes for American claims against Cuba. The plea deal should not only serve the interests of justice in a narrow sense but also consider the broader implications for American citizens who have waited decades for a resolution.

The decision you make will resonate beyond the courtroom, affecting the lives of thousands who have been left in limbo, waiting for a fair resolution. As such, I respectfully ask that you consider the broader ramifications of Ambassador Rocha's actions on the negotiation and settlement processes involving American property claims in Cuba.

Thank you for considering my perspective in this matter. I trust in your judgment and dedication to justice as you make this significant decision.

Sincerely,

Carolyn Chester CU 1704

Represented by Jason Poblete of Poblete Tamargo Attorneys

12/18/23, 7:41 AM                              Manuel Rocha tried to buy certified U.S. property claims against Cuba I Miami Herald

     

                                                                                                              



**Part of the McClatchy Media Network**

---

News   Sports   Business   Politics   Opinion   Food & Drink   Climate Change   •   Sports Betting

---

CUBA

# Ex-diplomat accused of working for Cuba bought claims to property confiscated by Castro

BY **NORA GÁMEZ TORRES**
DECEMBER 18, 2023 5:30 AM



https://www.miamiherald.com/news/nation-world/world/americas/cuba/article283025118.html                                    1/10

The Miami Herald profiled former Ambassador V. Manuel Rocha in 2003 when he joined the firm of Steel Hector & Davis to help open doors in Latin America. He had been charged by federal prosecutors of beinug a covert agent for the Cuban government. RAUL RUBIERA *Miami Herald Staff*

Manuel Rocha, the former U.S. ambassador arrested in Miami earlier this month accused of being a covert agent for Cuba, had a reputation for being a staunch anti-communist Republican.

He advocated maintaining the decades-long embargo against Cuba in a 2004 event at the University of Miami, warning that lifting it before Fidel Castro's demise would lead to leadership succession within the same communist system, and not democracy, the Miami Herald reported at the time.

Rocha later told an FBI undercover agent his "right-wing persona" was part of an act following orders from Cuban intelligence, according to his admission, taped in video and quoted in a federal indictment.

But there was more.

For years, Rocha led behind-the-scene efforts to buy claims on U.S. properties in Cuba that had been confiscated without compensation during the early days of Fidel Castro's revolution and to promote investment on the island to weaken the U.S. economic embargo on the island. The recent charges against Rocha call into question why he did it and what the Cuban government's interest in the claims could have been.

Around 2007, Rocha and his partner, Timothy Ashby, a lawyer and former deputy assistant secretary of the U.S Commerce Department, began traveling around the country trying to buy some of the property claims, which they transferred to an offshore company with the plan to later negotiate compensation from the Cuban government.

Ashby, who still works as a consultant advising companies about doing business with Cuba, said he was "completely shocked" when the charges against his former partner were recently unveiled.

"He was the last person I would have ever thought had been a Cuban intelligence agent," he said. "He was strongly anti-communist, very pro-Republican, quite conservative. And he made a point of that throughout the whole time I knew him."

Ashby described Rocha as "energetic" and "keen to make money. He never felt that he was fully compensated for all the hard work he put into government." He said he met Rocha through an acquaintance and that the former ambassador attracted "non-U.S. investors" interested in his plan.

The U.S. claims to confiscated property in Cuba lie at the heart of the U.S. embargo. U.S. law requires a resolution of the issue before the embargo — imposed on Cuba during the early days of the revolution — can be lifted.

U.S. citizens and companies hold 5,913 certified claims to confiscated property in Cuba, with an estimated value of $8.7 billion. The two governments held preliminary talks on a potential settlement under the Obama administration, but Cuba ultimately rejected the effort.

If Rocha and Ashby's plan had succeeded, the two countries might have been on the verge of fully normalizing relations.

The claims are also one of the biggest impediments the Cuban government faces in attracting foreign investment to the island, because they scare away big companies and investors worried about potential U.S. lawsuits for "trafficking in confiscated property" or losing their visas to enter the United States. Those are two of the potential penalties in a law Congress enacted in 1996, the Cuba Libertad Act, to punish foreign companies that do business in Cuba involving such properties.

Rocha's involvement in the plan has not been previously reported. If he was acting as an agent of the Cuban government, as U.S. prosecutors charge, he might

have had motivations other than making money.

Jason Poblete, a lawyer and expert on the confiscated properties, said he believes Cuba has been trying for years to find alternative ways to remove the legal threats posed by the claims.

For the communist government, figuring out a way to "get rid" of the claims on premier properties could pave the way to foreign investment, he said.

If a "friendly" offshore company owned the claims, Poblete said, it could sign a contract with the Cuban company wanting to attract foreign investment and guarantee it would not sue over "trafficking on confiscated property" so that the foreign investment could move ahead.

Poblete has asked the U.S. State Department and Congress to investigate Rocha's actions on the property claims.

"If you're going around selling your claim to somebody who's doing it for Cuba to facilitate an investment that it has wanted to do, let's say, with a French company, that's against U.S. policy because it makes it easier for foreigners to invest in Cuba under the embargo in place," he said.

In light of the accusations against his partner, Ashby said that he now sees how the plan to buy the claims might have served the Cuban government's interests, though that was not how he saw it at the time.

"Well, in retrospect, yes," he said. "This was a way actually to end the embargo. So, on one hand, yes, it would benefit the Cubans. On the other hand, it would have benefited the U.S. claim holders.... So we saw it both ways. But I must emphasize that it was strictly a business opportunity that we saw, and other investors saw it as well. We didn't think it was actually benefiting the Cuban Communist government. We thought it was benefiting capitalism."

"I'm a believer that capitalism kills communism," he added.

## THE CALL

One day in November 2007, Carolyn Chester was at work when she received a phone call.

It was Rocha, who said he had an offer to buy her claim to properties that had been owned by her father and which had been confiscated by Castro shortly after taking power in 1959. Her father, Edmund Chester, was a former CBS and Associated Press journalist who had written speeches for the island's toppled dictator, Fulgencio Batista.

Rocha and Ashby traveled to Omaha, Nebraska, where she lives, and met with her on Dec. 13, 2007, for two and a half hours — asking her to sign a non-disclosure agreement before the conversation began.

"They showed up in a limo," she said.

The Herald reviewed an email exchange between Rocha and Chester and an unsigned draft of the non-disclosure agreement.

Chester recalls being dismayed to hear from the two men that her claim to farmland in the Isle of Youth and stocks in the defunct Cuban Telephone Company, which the U.S. Foreign Claims Settlement Commission valued at almost half a million dollars in 1970, was worth "pennies on the dollar."

Because of the 6% interest the claims accrue annually, its worth in 2007 would have been much higher than the 1970 valuation. Chester rejected Rocha and Ashby's attempt to buy her claim, calling it "ridiculous," but didn't tell the Miami Herald the amount of their offer, citing the non-disclosure agreement she had signed.

Javier Bengochea, a neurosurgeon who inherited claims to the port of Santiago, Cuba's second-largest city, said Ashby also contacted him with an offer to buy them. However, he said nothing came of the meeting because he had no intention to sell.

After news of Rocha's arrest broke, Chester told the Herald she had always thought the encounter was suspicious.

"They made the whole presentation basically saying that my government didn't care about me, that we were never going to get anything," she said. "But I was not going to sell them my claim because I didn't believe them; they were talking like they were a little bit too knowledgeable about what the Cuban government would and wouldn't do."

She said the meeting left her "mad."

Without naming Rocha or Ashby, Chester wrote a letter to U.S. Secretary of State Thomas Shannon in June 2009, complaining that "lawyers and consultants…were traveling all over the country buying up the claims for a fraction of their worth. Their credentials are so impressive that they almost come off as government officials."

"These experts on Cuba and Cuban investments are too involved and have developed uncomfortably close relationships with the Cuban government and foreign investors in Cuba," she added.

She also contacted Poblete shortly after the meeting with Rocha and Ashby in November 2007.

Poblete said he flagged the efforts to buy the claims to Mauricio Tamargo, who at the time was chairman of the U.S. Foreign Claims Settlement Commission. Tamargo is currently a partner at the law firm Poblete and Tamargo.

In March 2008, a few months after the Omaha meeting, the Commission urged property claim holders to seek legal advice before selling their claims. Then, in July 2008, the Treasury Department's Office of Foreign Assets Control warned that transferring certified claims against Cuba "is generally prohibited absent authorization."

That warning eventually put an end to the claims-buying effort, Ashby said, because the U.S. company he and Rocha created never got a Treasury license for the transactions despite spending a million dollars in lobbying efforts.

## THE PLAN

Ashby, who first made a career as an analyst advocating for tougher policies on Cuba for the conservative Heritage Foundation during the Reagan era, told the Herald the idea to set up a company to buy the claims to confiscated properties resulted from his interactions with Cuban officials when he was a Commerce Department official handling Cuba matters between 1987-90.

"The reason, the way this came about…I was the point man for the administration to negotiate with the Cubans on a variety of things. And they approached me and said they would like to settle the claims," Ashby told the Herald.

He said that before Cuba's approach, he had no knowledge about the claims issue. But he said other Republican senior political appointees he worked with at the time told him that finding a way to settle the claims was "a really good idea."

"It was the biggest impediment to actually restoring normalized relations. And we thought it would provide leverage actually to see change in Cuba. And I still believe that," Ashby said.

In the past, some U.S. claim holders have received payments from companies wanting to do business with Cuba involving confiscated property. In 1997, STET International Netherlands N.V. signed an agreement to pay approximately $25 million to ITT Corporation for a 10-year right to use its confiscated facilities and equipment in Cuba.

But Ashby and Rocha's plan was different.

They recruited investors and partners to create several companies, including Siboney LTD, registered in the Isle of Man, a United Kingdom tax haven, along with a subsidiary registered in Nevada, Clarinbridge LLC. The U.S. company would buy the claims, then transfer them to Siboney LTD.

Since Siboney LTD, the company that would hold the claims, was not under U.S. jurisdiction, the idea was it would be able to negotiate joint ventures with the Cuban government — which American companies cannot do because the embargo prohibits it.

"The fund that has the claims would sit with the Cuban government and ask, 'What do you have to offer?' It could be anything from beachfront property or shares in pre-existing hotels," Ashby told CubaNews in 2010. "In some rare cases, it could be a joint venture. Everything would be in partnership with the Cubans."

The two men ultimately bought nine claims, Ashby told the Herald. In December 2007, just days after the meeting with Chester, Clarinbrige LLC bought a Missouri company's oil-exploration rights in Cuba for $1 million.

Ashby said he and other investors saw a profitable business opportunity to make money, which he laid out in a 2009 paper for the Journal of Inter-American Law Review, in which he highlighted that financial speculation on the claims yielded high investment returns.

Because the owners of U.S.-certified property claims against Cuba would probably receive "minimal value in compensation whether they pursue the time and expense of litigation in a Cuban court, or wait for the U.S. government to settle on their behalf," the paper concluded that "the optimal solution" would be a private sector settlement through a fund holding the claims to avoid "contentious and protracted diplomatic negotiation."

Ashby, who says he is a "regulatory compliance specialist," told the Herald he thought the plan was legal and "done very strictly by the book."

After the Treasury pushed back against it, Ashby went public about what he said was his idea to buy some of claims to later seek a deal with the Cuban government, he told el Nuevo Herald and business publication CubaNews in 2010. But those stories make no mention of Rocha.

The stories said foreign investors led the effort and that Ashby was merely representing the companies involved. But Ashby told the Herald that he and Rocha were stockholders and managers of Siboney LTD.

Rocha and Ashby were also managers of a Miami-based consulting firm called Cabesterre L.L.C., which advised clients on doing business with Cuba.

Miami-Colombian businessman Rodrigo Arboleda was also listed as manager of Cabesterre, along with Mark Entwistle, a former Canadian ambassador to Havana. Entwistle was also a manager at Clarinbridge LLC.

The Herald called the phone number associated with Arboleda's residence in Miami, but a man who picked it up said in Spanish that he didn't know anyone with that name. Entwistle did not reply to an email seeking comment.

Cabesterre was active between 2006 and 2009, when it was dissolved, around the same time Ashby said he and Rocha decided to part ways.

Ashby told the Herald he no longer has "any interest in any of the claims, legally or otherwise."

He said he "voluntarily" gave up his interest in the Isle of Man company, Siboney LTD.

For the past decade, Ashby has made a side career writing spy novels.

"It's very ironic," he said. "I've spoken to other friends and acquaintances who consider themselves friends of Manuel. And they feel the same way that I do. We're all just stunned by it."



NORA GÁMEZ TORRES

305-376-2169

Nora Gámez Torres is the Cuba/U.S.-Latin American policy reporter for el Nuevo Herald and the Miami Herald. She studied journalism and media and communications in Havana and London. She holds a Ph.D. in sociology from City, University of London. Her work has won awards by the Florida Society of News Editors and the Society for Professional Journalists.//Nora Gámez Torres estudió periodismo y comunicación en La Habana y Londres. Tiene un doctorado en sociología y desde el 2014 cubre temas cubanos para el Nuevo Herald y el Miami Herald. También reporta sobre la política de Estados Unidos hacia América Latina. Su trabajo ha sido reconocido con premios de Florida Society of News Editors y Society for Profesional Journalists.

Take Us With You